UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUNE WILLIAMS,

               Plaintiff,                             Case No. 02-72234

vs.

                                      HONORABLE CHIEF JUDGE BERNARD A. FRIEDMAN
JO ANNE B. BARNHART,           HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____/

**REPORT AND RECOMMENDATION**

**I.**      **Background**

Plaintiff brought this action under 42 U.S.C. §405(g) to challenge a final decision of the Commissioner regarding the application she submitted on behalf of her child (R.R.) for Child's Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be GRANTED and Defendant's motion for summary judgment be DENIED and this matter be remanded to the Commissioner for further determination, as more fully described below.

**A.**      **Procedural History**

Plaintiff submitted the SSI application on behalf of R.R. on December 15, 1999, alleging that R.R. had became disabled on September 15, 1997, due to asthma, pneumonia, poor eyesight and shortness of breath (R. 31, 35). R.R's application was denied upon initial review. An administrative hearing was held on August 9, 2000, at which Plaintiff and R.R. testified and R.R. was represented

by an attorney (R. 344).  On September 15, 2000, ALJ Thomas decided R.R. Walters was not disabled (R. 132-36).  The Appeals Council denied Plaintiff's request for review (R. 159-60).

Plaintiff sought judicial review of the Commissioner's final decision, and on February 11, 2003, this Court granted Defendant's request for remand due to the unavailability of the administrative claims file (R. 144-56).  On remand, a supplemental hearing was held on August 5, 2004, before ALJ Ethel Revels at which Plaintiff and R.R. testified again with attorney representation (R. 369).  On July 27, 2005, ALJ Revels issued her decision finding R.R. not disabled because she did not exhibit an impairment or combination of impairments that met, medically equaled, or functionally equaled a listed impairment (R. 13- 22).  The Appeals Council denied Plaintiff's request for review.

**B.    Background Facts**

> **1.    *Medical Evidence***

On December 9, 1997, James Aronotiz, D.O., examined R.R. for mouth breathing and obstructive sleep apnea symptoms (R. 117).  His impression was tonsil and adenoid hypertrophy and allergic rhinitis.

On April 13, 1998, R.R. was seen at the St. John Health System complaining of a cough lasting three weeks (R. 114).  On May 20, 1998, R.R was seen at St. John complaining of a congested cough lasting one month (R. 113).

On December 22, 1998, R.R. was seen at St. John complaining of a cough and congestion (R. 111).

On February 12, 1999, R.R. was seen at St. John complaining of diarrhea and coughing (R. 110).  The largely illegible note appears to indicate that R.R. was prescribed a three day course of

Prednisone. Pharmacy records indicate that R.R. filled a Pediapred (pediatric prednisone) prescription on February 15, 1999 (R. 88-89).

On March 10, 1999, R.R. was seen at St. John for coughing, congestion and diarrhea (R. 109). On March 26, 1999, R.R. was seen at St. John for asthma (R. 108). The examination results are illegible.

On April 22, 1999, R.R. was seen at St. John for ring worm and congestion (R. 107). On May 11, 1999, R.R. was seen at St. John complaining of cough and cold symptoms (R. 106).

On September 9, 1999, R.R. was seen at St. John complaining of cough, vomiting and loss of appetite (R. 103).

On November 9, 1999, R.R. was seen at St. John complaining of cough and congestion (R. 102). The largely illegible note appears to indicate that R.R. was prescribed a three day course of Prednisone. On December 16, 1999, R.R. was seen at St. John for asthma and cough (R. 101). Pharmacy records indicate that R.R. was prescribed Prednisolone (R. 88).

On December 28, 1999, R.R. was seen for a follow-up regarding pnuemonia and complained of ear pain (R. 100).

On February 22, 2000, R.R. was seen at St. John complaining of cold symptoms, examination revealed no wheezing (R. 99).

On March 17, 2000, Marlene T. Mansour, M.D., examined R.R. on behalf of the Michigan Disability Determination Service (R. 68). Plaintiff reported that she had good prenatal care during her pregnancy with R.R. and R.R. had been delivered full-term. Plaintiff reported that R.R. had been diagnosed with asthma at age four, had been hospitalized twice for asthma exacerbations and pneumonia; and had numerous clinic and emergency room visits for asthma. She used a home

nebulizer every four hours as needed for wheezing or breathing problems and had been placed on Pediapred in the past. She had a number of school absences due to asthma. Upon examination Dr. Mansour found no throat congestion or nasal/oral discharges, clear breath sounds with no rales or wheezes, regular heart rate and rhythm, and a normal neurological examination (R. 69). Dr. Mansour opined that Plaintiff's asthma was under "fair" control with her medications, provided triggers were minimized and her physical and neurological examinations were unremarkable (R. 69-70).

On April 3, 2000, R.R. was seen at St. John complaining of an asthma attack and cold symptoms (R. 98). Pharmacy records indicate that R.R. was prescribed Prednisone on April 3, 2000 (R. 88). On April 18, 2000, R.R. was seen for a follow-up and reported no asthma attacks or respiratory distress since last visit (R. 97).

On April 24, 2000, the state agency reviewer determined that R.R.'s asthma was severe, but did not meet or equal the Listing (R. 72-73). The reviewer found R.R. to have no limitations in the cognition/communication or "personal" areas of development and less than marked limitations in her motor skills, social functioning and concentration, persistence and pace (R. 74).

On May 16, 2000, R.R. was seen at St. John for sore throat and a productive cough (R. 95). She reported receiving two breathing treatments per day.

On August 1, 2000, R.R. filled a prescription for ibuprofen, Augmentin (antibiotic) and Neo/Polymyxin (ear infection drops) (R. 124). On August 24, 2000, R.R, filled prescriptions for Albuterol and Chlorine to be distributed through her nebulizer every four to six hours as needed for wheezing, an albuterol inhaler (two puffs, three times daily as needed for wheezing when away from home) and Cefzil (antibiotic) (R. 125).

An August 31, 2000, letter from Audrey J. Hamilton, M.A, indicates that R.R. was being evaluated for Attention Deficit Hyperactivity Disorder (ADHD) (R. 126).

On March 8, 2002, R.R. was seen at St. John complaining of sore throat and coughing, but no respiratory distress (R. 269).  She was diagnosed with bronchitis and prescribed Augmentin and a refill on her Albuterol (R. 270).

On May 24, 2002, R.R. was seen at St. John complaining of abdominal pain, loose stool and sore throat (R. 271).

On September 25, 2002, R.R. was seen at St. John complaining of asthma, difficulty breathing and sore throat (R. 288).  An examination revealed that her lungs were clear, and she was diagnosed with allergic rhinitis with postnasal drip and asthma (R. 289).

On November 4, 2002, Suzanne Johnson, C.S.W., completed a clinical assessment and determined that R.R. had "Attention Deficit Hyperactivity Disorder Predominantly Inattentive Type" (R 202).  She further opined that medication served to calm R.R. and the prognosis for success with therapy was "good" if she kept appointments.  Ms. Johnson ascribed to R.R. a GAF of 55 (R. 203).[1]

On November 27, 2002, R.R. was seen at St. John for ringworm, headache, sore throat and stomachache (R. 293).  She was prescribed 60 milligrams of Prednisone (R. 294).

On May 29, 2003, R.R. was seen in the emergency room complaining of wheezing and difficulty breathing with cough lasting one month (R. 242, 246).  Examination revealed an "alert,

---

[1] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30.  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.  A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

active child not in distress", slight runny nose, clear lungs (with occasional scattered wheeze) (R. 242, 248). The impression was acute bronchial asthma. She was prescribed a five day course of steroids and discharged home (R. 242, 248).

On June 19, 2003, an examining psychiatrist at the Northeast Guidance Center indicated that R.R. was making improving academic progress, though this was hampered by her asthma, and continued to progress through her developmental milestones without delays (R. 231).

On July 2, 2003, R.R. was seen at St. John complaining of stuffy nose and sneezing (R. 304). She was wheezing upon expiration and her oxygen level was 99. She was diagnosed with asthma and sinusitis (R. 305). She was prescribed various medications, but apparently no steroids. On July 30, 2003, her asthma was described as stable (R. 307).

On October 21, 2003, R.R. was apparently assessed for sleep disorder, but the test results are not in the record (R. 250-52).

On November 10, 2003, R.R. was reassessed by Ms. Johnson, who indicated that R.R. was getting along well with students and teachers, did not have many friends and the teachers only reported "good things" about her (R. 210). Ms. Johnson also noted that R.R.'s hyperactivity had been "reduced much" and she was doing much better since beginning therapy and medication (R. 212). R.R. was making a few friends, achieving better grades and no longer had an anger problem (R. 213).

On April 29, 2004, R.R. was seen at St. John complaining of cough and allergy symptoms (R. 314). She was diagnosed with asthma and allergic rhinitis and was prescribed various medications - though no steroids (R. 315).

On July 15, 2004, R.R. was seen at St. John complaining of wheezing (R. 316). Examination

6

revealed anterior and posterior expiratory wheezing (R. 317).  Albuterol therapy was prescribed.

A September 10, 2004, genetic evaluation ruled out genetic causes for R.R.'s ADHD, but scoliosis was detected (R. 321-325).

An October 3, 2004, nocturnal sleep study was normal (R. 334).  An October 22, 2004, daytime sleep study revealed excessive daytime sleepiness (R. 332).

On November 2, 2004, R.R. was seen for a follow-up at St. John.  Examination revealed clear lungs without wheezing (R. 338).  On December 14, 2004, R.R. complained of cold and cough symptoms and indicated that she stopped her ADHD medications for her sleep study (R. 340).  Examination revealed end expiratory wheezing, which was relieved after therapy (R. 339).  Her asthma medication prescriptions were refilled (Albuterol for breathing treatment, Singular, Advair and Albuterol inhaler).

On January 6, 2005, R.R. filled a prescription for Concerta (an ADHD medication) (R. 187).  On February 14, 2005, R.R. filled a prescription for Amoxicillin (antibiotic).

On May 5, 2005, Ms. Johnson reported that R.R. was getting along with other children at school and was doing well in reading, writing and math (R. 341).  R.R. reported that she attended church, went skating with friends and went to the park (R. 343).  R.R. was having some feelings of depression at this time, had been diagnosed with narcolepsy and was making "poor grades".  Ms. Johnson opined that R.R. needed to use cognitive techniques to reduce her feelings of frustration and hopelessness and imagery work to assist her in releasing unresolved feelings stemming from "witnessing her mother at gunpoint at age 3" (R. 342).  Ms. Johnson indicated that R.R. needed continued monthly out-patient therapy and could "step down" to medication maintenance when she was no longer depressed and making good grades (R. 343).  Plaintiff indicated that she could not

7

bring R.R. to more frequent therapy due to other obligations and medical appointments.

### 2.    *Plaintiff's Testimony*

#### (a.) August 2000 - original hearing

Plaintiff testified that R.R. was born February 16, 1992, and she lived with Plaintiff and her six-year-old brother (R. 348).  R.R. had recently completed summer school and, pending the results, she would attend third grade the following year.  R.R. was not enrolled in any special education program and had not had to repeat any grades at the time of the hearing.

Plaintiff alleged that R.R. had asthma attacks "every month, month and a half" requiring urgent doctor's visits (R. 350-51).  Plaintiff explained that R.R.'s doctors allowed her to bring R.R. to the office during attacks to avoid the emergency room, they felt it was "not necessary" for R.R. to be taken to the emergency room for these episodes because she was "such a regular at the office" (R. 350).  Plaintiff took R.R. to the doctor when the breathing treatments administered at home did not work and R.R. continued to suffer with diarrhea, loss of appetite and chest pains (R. 352, 366). The doctors administer further breathing treatments and R.R. has been given steroids three times (R. 352).[2]  The symptoms usually resolved in three to four days after the visit.  In March 2000, Plaintiff felt that R.R.'s condition required hospitalization, but decided not to have her admitted so as not to interfere with school and the "MAP" testing.  She asked the doctors to provide her with the "medication, the steroids and the antibiotics" so she could care for R.R. at home.

She took R.R. to the clinic in August 1, 2000, for chest and throat pain and a slight fever (R. 353).  R.R. apparently was also suffering from a headache and was diagnosed with an ear infection

---

[2] Plaintiff said the doctors were trying not to prescribe steroids too often because of the side-effects and prescribed antibiotics instead (R. 361).

(R. 354).

R.R. had ear infections six times in the 12 months preceding the hearing. Her asthma was triggered with excessive walking or physical strain (R. 360). She had difficulty walking due to shortness of breath and chest pain (R. 354). She was diagnosed with asthma at age four and the condition had progressed and she now suffered from recurrent pneumonia (R. 355). She had been diagnosed with pneumonia twice in the 12 months preceding the hearing. She had been hospitalized for pneumonia twice in two years. R.R. used a nebulizer four to five days a week four times a day (R. 356). She did not receive breathing treatments at school, but Plaintiff brought her Ventolin (inhaler) to school in the afternoons (R. 367).

R.R. had to attend summer school because she missed 60 day during the school year due to asthma (R. 357, 362). R.R. argued with her teachers in school and was reportedly talking to herself (R. 358). She also "beat up" her brother and was cruel to him a lot. Plaintiff said R.R.'s doctors were in the process of referring her to a psychiatrist. When asked if R.R. visited friends, Plaintiff replied "cousins", and indicted that she stayed to herself a lot. Plaintiff said R.R. did not get along with other children because she was too hyperactive and also hit frequently. R.R. could put away dishes and sweep, but had a hard time following directions (R. 359). Plaintiff described it as "being in her own little world" or "spaced out". Her teachers told Plaintiff they had the same problem in school (R. 360). The teacher said R.R. never pays attention and gets mad when corrected. The doctors restricted R.R. from climbing during gym class because she "kind of fell out one day" (R. 362).

R.R. spent her days with books and dolls and doing a little house cleaning. She can dress herself with a little help buttoning (R. 363). She went to church on Sundays. She walked one half

mile to school each day with Plaintiff accompanying her (R. 363-64).

Plaintiff indicated that R.R.'s behavior in school had not changed since an April 21, 1999, letter from her teacher described her as unable to stay in her seat, playing and wasting time in school and inconsiderate of the rights of others.

### (b.) August 2004 - hearing on remand

R.R. had been to the emergency room three times and seen for unscheduled doctors' visits seven times for asthma related complaints in the 12 months before the hearing (R. 373-75). During the doctor visits R.R. received two Albuterol breathing treatments and two Prednisone pills and was "put on" steroids, Prednisone, Singulair and antibiotics (R. 375, 378). The prescribed steroid course lasted three to four days (R. 379). Plaintiff indicated that she was prompted to take R.R. to the doctor seven times because R.R. just "stops breathing", and that steroids had been prescribed four times (R. 376). She indicated that the steroids were prescribed in October, December, March, May and July, but upon further questioning indicated that April was the last time R.R. was prescribed steroids.[3]

R.R. was restricted from attending gym class by her doctor (R. 382). R.R. did not pay attention in school and her teacher had complained several times (R. 384). She was receiving C's, but Plaintiff thought she could do better. R.R. sometimes forgot to turn in her homework and the teacher said she sometimes did not keep still (R. 385). She also got into fights, the last of which was the year before the hearing.

---

[3] ALJ Revels asked R.R.'s attorney whether there were any medical records or prescriptions to support this level of steroid use (R. 378). He answered that the medical records were from Dr. Watts and had been requested but were not in the file. He also appeared to indicate that there were supporting prescriptions in the file.

R.R. attended monthly counseling at Northeast Guidance Center for three years (R. 389-90). With medication R.R. was not inattentive and forgetful (R. 397).  She took her medication once a day during school days.  R.R. tried not to "be with too many people", wanted friends badly and overreacted around people (R. 393).  She did not get along with her brother and "beat him up" (R. 393-94).  When the medication wore off, after eight hours, R.R. was irritable and wanted to fight her brother (R. 398).

R.R. was scheduled for her second or third sleep disorder study to rule out sleep apnea, which was to take place September 30th (R. 395-96).  The first study had to be repeated because R.R's medication caused her to sleep straight through and no problem could be detected (R. 396).


R.R. did not "stick to" house chores she was assigned and instead sat around daydreaming (R. 429).

R.R. was going to undergo genetic testing to determine whether she had Lupus and whether she was affected by Lupus medication Plaintiff had taken during pregnancy (R. 433-34).

### 3.    *R.R.'s Testimony on Remand*

R.R. was 12 years old at the time of the hearing and entering seventh grade (R. 372, 377). She indicated that she received B's and C's and a couple of A's on her report cards (R. 410).  Her favorite subject was math (R. 412).

She had a best friend and six other friends (R. 411).  She would talk with them on the phone and sometimes see her best friend for birthday parties (R. 418).  She rode her bike a lot around her neighborhood and to her friends' houses (R. 412-13).  She felt that she sometimes got along with her brother, but he annoyed her by making noises, singing and following her (R. 413-15).  R.R. and

her brother had physical fights wherein she pushed him and he pushed back and they hit each other (R. 415-16).  She had tried to hit him with a notebook once and a shoe another time (R. 416).  The physical altercations did not occur often (R. 417).  The last fight she had with him started when she tried to stop him from fighting another boy.  He hit her, she hit him back, he jumped on her back and she flipped him to the grass.

She did not have any fights with other children during the last school year.  She did throw a pretzel at a child she thought had thrown one at her and was suspended for one day.

She had been having trouble sleeping for a year (R. 423).  She was sometimes depressed and shared this with her therapist (R. 421).  She felt that therapy improved her activities and feelings "a little bit" (R. 423).

She was able to dress herself and choose her own clothes (R. 424).  She was required to keep her room clean and assist with cleaning the house.  She was made to redo the tasks eighty percent of the time due to her completing it incorrectly.  She often failed to finish cleaning her room because she got sleepy or went outside or to another house to play (R. 425).  She did most of her homework, but failed to turn it in sometimes (not often) (R. 426).

### 4.      *Request to Hold Record Open*

Plaintiff's representative asked ALJ Revel to keep the record open until the August sleep study and September genetic testing were completed and until he could gather past records from Dr. Watts' office (which he had apparently tried unsuccessfully to secure) and Children's Hospital (R. 434).  ALJ Revel explained that, because this case was on remand and had already been around for several years, she was not inclined to hold the record open, but would consider any records submitted before her opinion was written.  She agreed to hold the record open for two weeks (R.

435).

### 5.    *ALJ Revel's Summary at the Hearing*

ALJ Revel indicated at the close of the hearing that Plaintiff's testimony regarding R.R.'s difficulties in school and poor grades were not supported by the record before her (R. 437). Plaintiff's representative agreed with this summary.

### 6.    *School Records*

On April 21, 1999, R.R.'s teacher sent home a form asking Plaintiff to discuss with R.R. her disruptive behavior, including her inability to stay in her seat (temper tantrums and hitting), playing and wasting time in school and lack of consideration for others (teasing another student) (R. 83).

On January 27, 2000, R.R.'s second grade teacher completed the School Activities Questionnaire, indicating that R.R.'s functional grade level was 1.5, R.R. had no speech problems, had missed 10 days during the first semester due to illness and was strong-willed which caused problems with other children and authority figures (R. 59).  She described R.R. as defiant if things did not go her way and possessing a short attention span and difficulty staying on task (R. 60).  R.R. was able to complete work unsupervised with reminding, complete and understand assignments (but got distracted) and had age-appropriate hygiene.

R.R. performed below average in vocabulary, reading comprehension and science, and performed average in mathematics on an April 2000 Metropolitan Achievement Test (R. 87).

**R.R.'s Grades**

|  | 2000 (R. 179) | 2001 (R. 179-80) | 2002 (R. 180) | 2003 (R. 180) | 2003/2004 (thru 1/15/04) (R. 177) | 2004/2005 (thru 1/20/05) (R. 185) |
|---|---|---|---|---|---|---|
| Reading | N | C | B | B | C |  |
| English |  | C | A | B | D | A |
| Creative Writing |  |  |  |  |  | B |
| Handwriting |  | C | B | B |  |  |
| Spelling |  | B | B | B |  |  |
| Phonics |  |  |  |  |  |  |
| Social Studies |  | D | B | B | B | D |
| Amer. History |  |  |  |  |  | D |
| Math | P | D | C | C | B | D |
| Science | P | C | B | B | A | C |
| Homework | C | C |  |  |  |  |
| Handwriting | B |  |  |  |  |  |
| Art |  | B |  |  |  |  |
| Music |  |  | B |  | B | C |
| Health Educ. |  | B | A |  |  |  |
| Comp. App. | B | C |  |  |  |  |
| GPA[4] | 2.6 | 2.09 | 3.1 | 3.0 | 2.6 | 2.0[5] |

The record also contains several Student Progress Reports that were sent to Plaintiff at various times indicating that R.R. was not completing assignments (R. 183, 184, 186, 189-193).

---

[4] Calculations based on each class being worth one credit.

[5] R.R. had stopped taking her ADHD medications during this time in preparation for the October 2004 sleep study (R. 340). The medications were filled again in January 2005 (R. 181).

### 4.      The ALJ's Decision

ALJ Revels found that R.R. was born February 16, 1992, was 13 years old and had never been engaged in substantial gainful employment (R. 22).  R.R.'s asthma and attention deficit disorder were severe but did not meet or equal any section in the Listing of Impairments in Appendix 1, Subpart P, Regulations No. 4 (the Listing).  ALJ Revels found R.R.'s subjective complaints credible only to the extent they were supported by medical evidence.

Because her impairment did not meet or equal any listing, ALJ Revels went on to determine whether R.R.'s impairments were functionally equivalent to any listing.  ALJ Revels found that R.R.'s impairments did not functionally equal the criteria of any of the listed impairments in the Listing because she did not exhibit an "extreme" limitation in one domain or "marked" limitation in two domains of functioning.  This determination was based upon ALJ Revel's finding that R.R. had "less than marked" limitation in acquiring and using information, "marked" limitation attending and completing tasks, "less than marked" limitation in moving about and manipulating objects, "less than marked" limitation caring for herself, and less than marked limitation in her health and physical well-being (R. 20-21).

ALJ Revels determined that R.R. was not under a disability at any time since the alleged onset date (R. 22).

## II.    Analysis

### A.      Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and*

*Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting*

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v.*

*Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

There is a three step process in determining whether a child is "disabled" under the

definition set forth in the Act. *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125

(6th Cir. 2003).  First, the child must not be engaged in substantial gainful activity; second, the

child must have a severe impairment; and third, the severe impairment must meet, medically

equal or functionally equal one of the impairments found in the Listing. *See* 20 C.F.R. §

416.924.

Under section 416.926(a), if a child's impairment - or combination of impairments - does

not meet or is not medically equivalent in severity to a listed impairment, then the Commissioner

will assess all functional limitations caused by the impairment to determine if the child's

impairments are functionally equivalent in severity to any of the listed impairments in the

Listing.  In assessing whether a child's impairment is functionally equivalent to a listed

impairment, the *Elam* Court explained that the following areas of development may be

considered: 1) cognition/communication, which is the ability or inability to learn, to understand

and to solve problems through reasoning; 2) motor, which includes the ability or inability to use

gross and fine motor skills to serve one's physical purposes; 3) social, which includes the ability

or inability to form and maintain relationships with other individuals and groups; and 4)

concentration, persistence or pace, which is the ability or inability to attend to and sustain

concentration on an activity or task.  *Elam ex rel. Golay*, 348 F.3d at 126 -127.  These areas of

development were derived from the six "domains"[6] set forth in 20 C.F.R. §416.926a:

> (i) Acquiring and using information;
> (ii) Attending and completing tasks;
> (iii) Interacting and relating with others;
> (iv) Moving about and manipulating objects;
> (v) Caring for yourself; and,
> (vi) Health and physical well-being.

20 C.F.R. §416.926a(b)(1).

A child is considered disabled when they show "marked" limitations in two domains of

functioning or an "extreme" limitation in one domain.  20 C.F.R. §416.926a(d).

Marked limitation in a domain occurs when ones "impairment interferes seriously with

ability to independently initiate, sustain, or complete activities," and an extreme limitation

occurs when an impairments interferes "very seriously," something "more than marked."  20

C.F.R. §416.926a(e).  The Regulations acknowledge that ones "day-to-day functioning may be

seriously limited when . . . impairment(s) limits only one activity or when the interactive and

cumulative effects of . . . impairment(s) limit several activities." *Id.*

**B.     Factual Analysis**

Plaintiff argues that the Commissioner erred in not finding that R.R. (a.) met the Listing

for asthma, (b.) met the Listing for attention deficit hyperactivity disorder and (c.) has a

functionally equivalent disability.

---

[6] Domains are defined as "broad areas of functioning intended to capture all of what a
child can or cannot do."  20 C.F.R. §416.926a.

17

1.    **Asthma - Listing 103.03**

Plaintiff argues that R.R.'s asthma meets Listing 103.03 in either category B or C, which

require

> B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks;
> Or
> C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:
> 1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
> 2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period . . . .

Listing §103.03B and C.

> Asthma attacks are defined as

> . . . prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

Listing §3.00C.

Therefore, in order to met 103.03B, R.R. would have had to have suffered, in spite of

prescribed treatment, asthma attacks at least once every 2 months or at least six times a year that

lasted one or more days and required physician intervention and intensive treatment, such as

intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator

18

therapy in a hospital, emergency room or equivalent setting.

Plaintiff points to the fact that R.R. had six unscheduled doctor's visits in April 1998-April 1999 and another six unscheduled doctors visits from May 1999-May 2000. This, she argues, meets the 103.03B criteria of an asthma attack every two months or six times per year. Yet, the severity of the attacks does not appear to meet the 3.00C definition. Most of these visits involved complaints by R.R. of sore throat, fever and/or coughing, not difficulty breathing. And, for those visits in which asthma intervention was provided, Plaintiff testified that R.R. was usually given two Albuterol breathing treatments and two Prednisone pills and was prescribed steroids, Singulair and antibiotics (R. 375, 378). There is no evidence of intravenous bronchodilator, intraveneous antibiotic administration or prolonged inhalational bronchodilator therapy.[7] Therefore, there is substantial evidence in the record to support ALJ Revels' finding that R.R. did not meet Listing 103.03B

Plaintiff also argues that R.R.'s asthma meets 103.03C because she was required to use daily and nocturnal sympathomimetic bronchodilators and was prescribed steroids. In order to qualify under Listing 103.03C, R.R. would have had to have been prescribed steroids "more than 5 days per month for at least 3 months during a 12-month period". §103.03C.

R.R.'s steroid use is documented as follows:

February 15, 1999 – filled prescription – unknown duration,
November 9, 1999 – given some in doctor's office and prescribed 3 day course,
December 16, 1999 – filled prescription – unknown duration,

---

[7] There is also a question regarding whether the doctor's office qualifies as "in a hospital, emergency room or equivalent setting". Plaintiff did testify that the doctors made special concessions so that R.R. would not have to go to the emergency room for her unscheduled visits, but the fact remains that the definition of a qualifying asthma attack requires that the symptoms be severe enough to warrant treatment at one of the enumerated facilities, and R.R. did not have go to a hospital, emergency room or equivalent setting every two months or six times per year.

April 3, 2000 – filled prescription – unknown duration and
May 28, 2003 – prescribed 5 day course in emergency room.

Plaintiff also testified the R.R. had been prescribed a three to four day course of steroids four times in the 12 months preceding the August 5, 2004, hearing (R. 376, 79-80).

R.R.'s steroid use for the period subsequent to April 3, 2000, does not reach the level required by the Listing – *five* days per month for *three* months in a 12 month period. From February 1999-April 2000, there is no evidence indicating for what period of time the steroids were prescribed. While there is a possibility that, for the specific period of February 1999-April 2000, the prescriptions were written for extended periods of time over five days per month or for recurring doses that would add up to five days per month for three months in this 12 month period, R.R.'s daily use of inhalers and nighttime breathing treatments do not satisfy the asthma listing level.

Plaintiff bore the burden of proving that R.R. was disabled. *See Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). She was required to present "complete and detailed objective medical reports of [R.R.'s] condition from licensed medical professionals." *See id.* (citing 20 C.F.R. §§404.1512(a)-(b), 404.1513(d)). Further, Plaintiff was represented by counsel, so this is not a case where the ALJ's duty to develop the record was heightened to require that she "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Gold v. Secretary of Health, Education and Welfare*, 463 F.2d 38, 43 (2d Cir.1972). Plaintiff had ample chances to provide information to support the contention that R.R. was prescribed steroids for five days per month for three months in a 12 month period – before the 2000 hearing, before the 2004 hearing, after the 2004 hearing (when ALJ Revels asked whether such documentation existed) but before ALJ Revels issued her opinion and upon appeal to the Appeals Council. Without any record evidence to the contrary, ALJ Revels opinion that R.R. did not meet the listing for asthma is

20

supported by substantial evidence.

### 2.   ADHD - Listing 112.11

The required level of severity to meet the ADHD Listing for children three to 18 years old

is present when there is medically documented findings of marked inattention, impulsiveness *and*

hyperactivity; and at least two of the following:

> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

> d. Marked difficulties in maintaining concentration, persistence, or pace.

A child has a marked limitation when his or her impairments seriously interfere with the

ability to independently initiate, sustain, or complete activities.  *Id.* at §112.00(C).

There is evidence in the record that R.R. was diagnosed with ADHD.  On November 4,

2002, she was diagnosed with ADHD predominately inattentive type (R. 202).  On June 19,

2003, she was diagnosed with ADHD 314.01, which can mean either a combination of

inattentiveness, hyperactivity and impulsivity or predominately hyperactive-impulsive type.[8] Therefore, the 2002 diagnosis, by definition, does not suggest R.R. was markedly impulsive. The 2003 diagnosis may have included observations of hyperactivity, impulsivity and inattentiveness.

Yet, while there is arguably documentation that R.R.'s inattentiveness interfered with her ability to independently initiate, sustain, or complete her school work and chores,[9] this not true regarding impulsivity and/or hyperactivity.  In fact, in the reports and report cards that were sent home from school since 1999, all but two teachers indicate that R.R.'s poor performance was due to poor study habits, missing class and/or incomplete/missing assignments (R. 83, 90-93, 177-78, 182-86, 189-93).  Despite the fact that all of the reports had a box to check labeled "very disruptive" and the report cards had a comment section where teachers could choose comment "06" which stood for "very disruptive", these options were exercised only twice.

First, in April 21, 1999, a teacher indicated that R.R. was unable to stay in her seat, playing and wasting time in school, and inconsiderate of the rights of others (R. 83).  Second, in a report by R.R.'s math teacher in the Fall of 2003, the teacher checked the box indicating R.R. was disruptive (R. 184).  Yet, this same teacher in March 2004 issued another report that indicated that R.R. had incomplete assignments and poor study habits, but did not indicate that she was still being disruptive.  In November 2004 another teacher indicated that R.R. was

---

[8] *See* www.adhd.org.nz/**dsm**1.html;  www.add.about.com/cs/addthebasics/a/**dsm**.html; www.psychnet-uk.com/**dsm**_iv/_misc/complete_tables.html.

[9] Yet, Plaintiff testified that R.R. was not inattentive or forgetful when taking her ADHD medication (R. 397).

missing assignments but did not choose to check the remaining boxes on this form that would have indicated that R.R. was disobedient, excessively playful, leaving class without permission, uncooperative, excessively talkative and shoving/pushing others (R. 189).

Furthermore, while the above analysis suggests that R.R.'s ADHD did not meet the Listing due to a lack of medical documentation of marked hyperactivity and impulsivity, there is also sufficient evidence to find that R.R. did not meet the "B" category of Listing 112.11 because she was not markedly limited in two categories from the enumerated list:  social functioning, personal functioning and/or cognitive/communicative functioning.

R.R. testified that she had some close friends that she talked with on the telephone and visited.  She also testified that she maintained her own personal hygiene.  And, there is no indication in the record that R.R. has any cognitive or communication problems.  Despite what some might consider some low grades, most of her teachers indicate that she is performing below her ability and, as stated above, makes low marks due to incomplete assignments and poor study habits, not hyperactivity or cognition problems.

Plaintiff did testify that she assisted R.R. in choosing clothes to wear (R. 363) and that R.R. had trouble getting along with other children (R. 359, 363), but this testimony conflicts with R.R.'s own testimony and the reports from R.R.'s teachers and the reports given by R.R.'s mental health treators that she was getting along better with teachers and students.

Therefore, there was sufficient evidence in the record on which ALJ Revels could rely in finding that R.R. did not meet the ADHD Listing.

### 3.    Functional Equivalency

As stated above, in assessing whether a child's impairment is functionally equivalent to a listed impairment, the *Elam* Court explained that the following areas of development may be considered: 1) cognition/communication, which is the ability or inability to learn, to understand and to solve problems through reasoning; 2) motor, which includes the ability or inability to use gross and fine motor skills to serve one's physical purposes; 3) social, which includes the ability or inability to form and maintain relationships with other individuals and groups; and 4) concentration, persistence or pace, which is the ability or inability to attend to and sustain concentration on an activity or task. *Elam ex rel. Golay*, 348 F.3d at 126 -127.

These areas of development were derived from the six "domains"[10] set forth in 20 C.F.R. §416.926a:

> (i) Acquiring and using information;
> (ii) Attending and completing tasks;
> (iii) Interacting and relating with others;
> (iv) Moving about and manipulating objects;
> (v) Caring for yourself; and,
> (vi) Health and physical well-being.

20 C.F.R. §416.926a(b)(1).

A child is considered disabled when she shows "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. §416.926a(d).

Plaintiff has not indicated in what domains she believes R.R.'s impairments cause "marked" or "extreme" limitations. Instead she reiterates more generally that R.R.'s impairments adversely affect her ability to "live a normal life" and participate in "normal childhood activities" and cause her to visit the doctor continuously and miss many days from

---

[10] Domains are defined as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. §416.926a.

school (Dkt. #24, p. 17). This Court does not consider issues that have not been fully developed by the briefs or in the record. Issues that are adverted to in a perfunctory manner without some effort at developed argumentation are generally deemed waived. *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir.2002). Further, "[i]t is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997). Therefore, the following analysis is somewhat limited by the argument set forth by Plaintiff.

### 1.    *Acquiring and Using Information*

In determining that R.R. had "less than marked" limitations in acquiring and using information, ALJ Revel relied on the fact that R.R.'s grades had significantly improved (R. 20).

R.R.'s grade trend actually shows that she was receiving poor marks again in the beginning of the 2005 school year despite an apparent upswing in the three previous years.[11] Yet, as stated above, none of her teachers indicated that she was unable to learn – i.e. unable to acquire and use information – and instead indicated that she was performing below her ability due to missing/incomplete assignments and absences from school. Plaintiff has not pointed to any record evidence to the contrary.

### 2.    *Attending and Completing Tasks*

ALJ Revels found that R.R. had "marked" limitations in attending and completing tasks. Plaintiff has not argued that R.R. is actually extremely limited in this capacity. "Extreme" limitation, as stated above, would require a very serious limitation, i.e. something more than

---

[11] Though it appears that R.R. had stopped taking her ADHD medication during this time period to prepare for a sleep study (R. 340).

"marked" limitation, which is defined as an impairment that "interferes seriously with ability to independently initiate, sustain, or complete activities".  20 C.F.R. §416.926a(e).

Beyond R.R.'s arguably poor grades and Plaintiff's testimony that R.R. often has to be reminded to complete tasks and sometimes looks at those talking to her without really hearing, there is no other documentation in the record that R.R. is more limited in this capacity than ALJ Revels found, much less that she meets the criteria to be considered extremely limited in this domain.

### 3.    Moving About and Manipulating Objects

ALJ Revels found that R.R. had no limitation in this domain (R. 21).  This domain measures how one moves their body from one place to another and how one moves and manipulate things – i.e. whether a claimant has limitations in the function of gross and fine motor skills.  20 C.F.R. 416.926a(j).[12]

---

12

(i) Moving your body involves several different kinds of actions: Rolling your body; rising or pulling yourself from a sitting to a standing position; pushing yourself up; raising your head, arms, and legs, and twisting your hands and feet; balancing your weight on your legs and feet; shifting your weight while sitting or standing; transferring yourself from one surface to another; lowering yourself to or toward the floor as when bending, kneeling, stooping, or crouching; moving yourself forward and backward in space as when crawling, walking, or running, and negotiating different terrains (e.g., curbs, steps, and hills).

(ii) Moving and manipulating things involves several different kinds of actions: Engaging your upper and lower body to push, pull, lift, or carry objects from one place to another; controlling your shoulders, arms, and hands to hold or transfer objects; coordinating your eyes and hands to manipulate small objects or parts of objects.

*Id.*

As an adolescent, R.R. would be expected to "use [her] motor skills freely and easily to get about . . . school, the neighborhood, and the community . . . participate in a full range of individual and group physical fitness activities . . . show mature skills in activities requiring eye-hand coordination . . . have the fine motor skills needed to write efficiently or type on a keyboard." *Id.*

The following are examples of limitations in functioning in this domain:

> (i) You experience muscle weakness, joint stiffness, or sensory loss (e.g., spasticity, hypotonia, neuropathy, or paresthesia) that interferes with your motor activities (e.g., you unintentionally drop things).
> (ii) You have trouble climbing up and down stairs, or have jerky or disorganized locomotion or difficulty with your balance.
> (iii) You have difficulty coordinating gross motor movements (e.g., bending, kneeling, crawling, running, jumping rope, or riding a bike).
> (iv) You have difficulty with sequencing hand or finger movements.
> (v) You have difficulty with fine motor movement (e.g., gripping or grasping objects).
> (vi) You have poor eye-hand coordination when using a pencil or scissors.

*Id.*

It is undisputed that R.R. walks to school each day, though sometimes this causes shortness of breath, and rides her bicycle. There is no evidence in the record to contradict ALJ Revel's finding that R.R. had no limitations in her gross or fine motor skills.

### 4. Caring for Oneself

As an adolescent, the regulations indicate that R.R. was expected to

. . . feel more independent from others and should be increasingly independent in all of your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries can make you feel angry or frustrated. You

should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down). You should begin to think seriously about your future plans, and what you will do when you finish school.

20 C.F.R. § 416.926a(k)(2)(v).

The following are examples of limitations in this domain:

(i) You continue to place non-nutritive or inedible objects in your mouth.

(ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).

(iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.

(iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.

(v) You do not spontaneously pursue enjoyable activities or interests.

(vi) You have disturbance in eating or sleeping patterns.

In determining that R.R. had "less than marked" limitation in this domain ALJ Revels relied upon Plaintiff's testimony that R.R. did not adequately care for herself, despite contrary testimony from R.R.  Again, Plaintiff has not provided any evidence to suggest that R.R.'s limitation in this domain is greater than ALJ Revels found.  Indeed, while Plaintiff testified that R.R. refused to use sanitary products during her menstral cycle and required assistance choosing her clothes, R.R. testified that she chose her own clothes and there is no report from R.R.'s school or therapists that her personal hygiene was an issue.  Further, while R.R. was found to have daytime sleepiness, this was apparently alleviated with adjustments to her medication and reduction of the four to five hour naps she had been taking after school (R. 19).

### 5. *Interacting With Others*

28

In determining that R.R. had "less than marked" limitations in interacting or relating to others ALJ Revels relied on medical records indicating that her social functioning had improved with ADHD medication (R. 21).  Further, while Plaintiff testified that R.R. fought with her brother and did not get along with other children, the record also contains R.R.'s testimony that she had friends and, as stated above, for the most part her teachers' reports failed to indicate that she had behavioral problems or difficulties getting along with others.

The Regulations provide some guidance on this issue, by giving a brief tutorial on what is expected of a child in R.R.'s age group with normal level functioning in this domain and giving some examples of limited functioning:

> Adolescents (age 12 to attainment of age 18).  By the time you reach adolescence, you should be able to initiate and develop friendships with children who are your age and to relate appropriately to other children and adults, both individually and in groups. You should begin to be able to solve conflicts between yourself and peers or family members or adults outside your family. You should recognize that there are different social rules for you and your friends and for acquaintances or adults. You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).
>
> (3) Examples of limited functioning in interacting and relating with others.
> .....
>
> (i) You do not reach out to be picked up and held by your caregiver.
> (ii) You have no close friends, or your friends are all older or younger than you.
> (iii) You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.
> (iv) You have difficulty playing games or sports with rules.
> (v) You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.

(vi) You have difficulty speaking intelligibly or with adequate fluency.

20 CFR § 416.926a(i)(2)(v) and (3).

R.R. testified that she has close friends and there is no evidence that she has problems communicating. Her mother testified that R.R. liked to spend time alone, but did not indicate that R.R. was unable to socialize. Therefore, regarding R.R.'s limitations in reacting or relating to others, it does not appear to fit within the Act's definition of a "marked" or "extreme" limitation.

### 6. Health and Physical Well-Being

In determining that R.R.'s limitations in the domain of health and physical well-being were "less than marked", ALJ Revels found that R.R. was "maintained on medication and was doing well" and that her therapist and psychiatrist had "indicated that no intervention is needed when the claimant is compliant with her medications" (R. 21).

This domain measures the cumulative physical effects of ones impairment and the associated treatment, and is meant to consider those effects not considered in the "moving about and manipulating objects" domain. 20 C.F.R §416.926a(l). Some examples of the kind of limitations contemplated by the Act as limitations in this domain are as follows:

(i) You have generalized symptoms, such as weakness, dizziness, agitation (e.g., excitability), lethargy (e.g., fatigue or loss of energy or stamina), or psychomotor retardation because of your impairment(s).
(ii) You have somatic complaints related to your impairments (e.g., seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia).
(iii) You have limitations in your physical functioning because of your treatment (e.g., chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments).
(iv) You have exacerbations from one impairment or a combination of impairments that interfere with your physical functioning.
(v) You are medically fragile and need intensive medical care to maintain your level

30

of health and physical well-being.

*Id.*

For this domain of functioning the regulations also indicate that a claimant may be considered to have a "marked" limitation if

> . . . you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, frequent means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more.  We may also find that you have a "marked" limitation if you have *episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks,* or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

20 C.F.R. §416.926a(e)(2)(iv) (emphasis supplied).

Because the measure of severity to be equaled appears to be measured using the total duration of the episodes, three events lasting two weeks, it appears equivalence would involve more or fewer events incapacitating the claimant for a total of 42 or more days a year (3 events at 14 days each = 42 days).

Plaintiff testified that R.R. missed as many as 60 days of school in a year due to her impairments and related doctor's visits.  Even though this exact number does not appear to be supported by the record, R.R.'s teachers repeatedly reported that she was performing below her apparent ability due to missing assignments and absences.  The record also shows that R.R. required unscheduled doctors visits up to six times per year in the period from April 1998-May 2000, although the duration of these episodes of incapacitation are not clear.  Further, ALJ Revels statement that R.R.'s mental health treators stated that she needs no further intervention when compliant with her medications relates to her behavioral problems and does not take into

31

account the intervention and missed school required for her physical impairment of asthma.

20 C.F.R. §416.926a(e)(2)(iv) *allows* for a finding of "marked" limitation for episodes occurring more often than 3 times in a year and involving 42 days or more of incapacity. It may be that R.R.'s frequent exacerbations constitute a "marked" limitation in this domain. And, because ALJ Revels found that R.R. had a "marked" limitation in the Acquiring and Using Information domain, a finding of "marked" limitation in this domain would result in a finding of equivalence.

ALJ Revels failed to indicate how R.R.'s recurrent exacerbations, which resulted in six unscheduled doctors visits each year from 1998-2000 and many missed school days, effect this domain. Nor did she make findings on the number of the days of incapacity. Therefore, on the present record, there is not substantial evidence to uphold the Commissioner's finding that R.R. did not functionally equal the Listings and the decision of the Commissioner cannot be upheld.

The remaining question is whether to remand for further proceedings or for an award of benefits. *Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher,* (*citing Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)).

In order to show that R.R. met Listing 103.03C in February 1999-April 2000, further inquiry into the duration of R.R.'s steroid prescriptions is required. And, a finding of "marked"

limitation in the Health and Physical Well-Being domain based on frequent exacerabations is discretionary. Therefore, this matter should be remanded for consideration of whether (a.) R.R. met Listing 103.03C in February 1999-April 2000 due to required steroid use and (b.) a finding of "marked" limitation in the Health and Physical Well-Being domain is warranted.

## III.   RECOMMENDATION

For the reasons stated above, it is Recommended that Plaintiff's Motion for Summary Judgment be GRANTED and Defendant's Motion for Summary Judgment be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: April 18, 2007                          s/Steven D. Pepe_____
Ann Arbor, Michigan                            United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on <u>April 18, 2007</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>James A.Brunson, AUSA, Lea G. Bullock, Esq.</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participnats: <u>Social Security Administration, Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606</u>

s/ James P. Peltier
James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church St.
Flint, MI 48502
810-341-7850
pete_peltier@mied.uscourts.gov